IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DREW FRANCIS,<br>    Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| LEHIGH UNIVERSITY, | : | NO. 10-CV-4300 |
|     Defendant. | : | |
| | : | |
| | : | |

**MEMORANDUM OPINION**

**Tucker, J.**                                 **March \_\_\_\_, 2013**

   Presently before the Court are Defendant Lehigh University's Renewed Motion for Summary Judgment as to Plaintiff Drew Francis' disability discrimination claim (Doc. 71), Plaintiff Drew Francis' Response in Opposition thereto (Doc. 72), and Defendant Lehigh University's Reply in Support of its Renewed Motion for Summary Judgment (Doc. 77), along with Plaintiff's Statement of Undisputed Facts (Doc. 73) and Defendant's response thereto (Doc. 78). Upon consideration of the parties' motions with briefs, and for the reasons set forth below, Defendant's motion for summary judgment will be granted.

**I.   BACKGROUND**

   The instant action stems from circumstances surrounding Plaintiff Drew Francis's ("Plaintiff") termination from Lehigh University. Plaintiff brings this suit against Defendant Lehigh University for an alleged violation of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, ("ADEA").

In 1995, Plaintiff accepted a temporary position within Lehigh's Department of Theatre in its College of Arts and Science as a technical director/scene designer. Approximately three months later, Plaintiff accepted a tenure track professor position with the University. In 1996, Plaintiff was promoted to Associate Professor in the Department of Theatre. In July 2001, Plaintiff was granted tenure at the rank of Associate Professor.

In November 2001, Plaintiff fell off a ladder and suffered a fractured foot, ankle, and back. Upon receiving medical clearance to return to work, Plaintiff submitted a list of twelve (12) accommodations to his supervisor that he claimed were necessary for him to be able to perform his jobs. Plaintiff's requests included a personal driver, a wheelchair, wheelchair accessible office space, drawing tables and hand tools, assistance with opening doors on campus, repair of a computer, and a personal assistant to help him with certain sedentary duties. Plaintiff admits that he received many of these accommodations, and continued to receive them through 2008.

In October or November of 2007, a female University student, D.C., approached Pam Pepper ("Professor Pepper"), then Professor in the Department of Theatre, to discuss a concern about another female University student, B.V., and Plaintiff. D.C. related that she believed that Plaintiff and B.V. were having a sexual relationship and she felt that Plaintiff was taking advantage of B.V. D.C. also told Professor Pepper that she had a sexual relationship with Plaintiff. Professor Pepper requested that D.C. file a complaint with the University's Harassment Policy Officer; however, D.C. declined to take such action at that time.

Professor Pepper met with Professor Augustine Ripa ("Professor Ripa"), then Chair of the Department of Theatre, and Dr. Christine Cole ("Dr. Cole"), University Harassment Policy Officer, the morning after her discussion with D.C. to discuss D.C.'s allegations. At the time, it

was noted that the University Harassment Policy prohibited relationships between faculty and students that created a supervisory conflict of interest. The University did not begin an investigation at the time because a complaint had not been filed and there was no knowledge of a supervisory conflict. Dr. Cole requested that Professors Pepper and Ripa monitor the matter and report any further information that they discovered.

In the late summer or early fall of 2008, allegations surfaced once again regarding Plaintiff's contact with University students. More specifically, Professor Erica Hoelscher, Plaintiff's ex-wife who was also a professor in the University's Department of Theatre, had separate conversations with Professors Pepper and Ripa about her divorce from Plaintiff and its impact on her continued work. Professors Pepper and Ripa both testified that Professor Hoelscher informed them that, while married to Plaintiff, she had learned that Plaintiff had an affair with B.V. over a period of time when Plaintiff taught and otherwise supervised B.V.'s work. Professor Ripa further explained that Professor Hoelscher stated that she believed B.V. and Plaintiff were in a relationship after discovering electronic messages between the two of them.

Based upon the information from Professor Hoelscher, Professors Pepper and Ripa, along with another professor in the department, contacted the Dean of the College of Arts and Sciences, Anne Meltzer, for guidance with regard to the situation. Following their meeting with Dean Meltzer, Dean Meltzer and Professor Pepper met with Dr. Cole, the University Harassment Policy Officer, to determine their next steps. At that meeting, it was decided to initiate the investigation process under the University Harassment Policy. Professor Pepper, as then Chairperson of the Department of Theatre, was to prepare a letter outlining the Theatre Department's concerns about the allegations against Plaintiff, including the student complaint,

3

referred to with anonymity to maintain confidentiality of the identity of the female student, D.C. It was further suggested that Professor Pepper contact the female student, D.C., to determine if D.C. would file a complaint.

On December 4, 2008, Professor Pepper filed an anonymous Internal Complaint with the University Harassment Policy Officer, outlining the information regarding Plaintiff's sexual conduct toward female University students during periods of time that Plaintiff taught and/or supervised the students' work. The Internal Complaint included and referenced information gleaned from: (1) a further conversation with D.C., who stated that her relationship with Plaintiff occurred while she was under his supervision; and (2) multiple conversations with Professor Hoelscher that indicated Plaintiff engaged in sexual conduct with students, including B.V., while under his supervision, as well as rumors circulating about Plaintiff's sexual conduct with students. Based on this Internal Complaint, the University's Faculty Investigators, Dr. Cole and Dr. Art King, began an investigation into Plaintiff's conduct with students.

At the time of Plaintiff's alleged conduct with female students D.C. and B.V., the University maintained an Harassment Policy that provided as follows:

> A supervisor should avoid developing a romantic or sexual relationship with an employee. Similarly, an instructor (e.g., advisor, course instructor, teaching assistant) should avoid developing a romantic or sexual relationship with a student taught, advised, or supervised by that instructor. If such a relationship does develop, it is a conflict of interest for one party to continue in any type of supervisory role . . . It is the responsibility of the person in the supervisory role to resolve the conflict of interest. Failure to resolve a conflict of interest puts the supervisor at risk for charges of sexual harassment.

(*See* Def.'s Br., Lehigh University's Policy on Harassment §2.3, attached as Exhibit O.) The Policy further provides the following:

> 7.1 Harassment is a serious offense that will not be tolerated in an educational, working, co-curricular, social, or living environment.

Disciplinary action may include, but is not limited to:

    Corrective action or restitution
    Written reprimand
    Requirement to attend training
    Work restrictions
    Suspension
    Demotion with reduction in pay
    Student expulsion
    Termination of employment of University employees

(*Id.* at §7.1)

In April 2009, during the pendency of the University's internal investigation, Plaintiff told Professor Pepper that he could not hold items and that he was in a great deal of pain. He further advised Professor Pepper that he would require surgery for this impairment; he did not know what the outcome would be; and he feared that he would not be able to do his job. Plaintiff claims that Professor Pepper responded that "we'll cross that bridge when we get there" and was very dismissive regarding his medical issue.

On May 12, 2009, the Faculty Investigators documented the findings of their investigation. (*See* Def.'s Br., Report of the Faculty Investigators, attached as Exhibit N.) The Faculty Investigators determined that Plaintiff violated this Policy because Plaintiff engaged in graphic sexual discussions with D.C. and engaged in a sexual relationship with B.V. at times when Plaintiff supervised and/or issued grades to both students. The Faculty Investigators also noted that Plaintiff was not truthful during their interviews with him and expressed no remorse or responsibility for his actions. Upon consideration of their findings of fact, the Policy, and in consultation with the Dean and other senior administrators of the University's College of Arts and Sciences, the Faculty Investigators recommended that Plaintiff be removed from the University environment and Plaintiff's employment as a tenured professor be terminated.

On June 10, 2009, the University's then Provost and Vice President for Academic

Affairs, Dr. Mohamed S. El-Aasser, provided Plaintiff a copy of the Report of the Faculty Investigators. At this time, the Provost notified Plaintiff that he adopted the recommendation of the Faculty Investigators and that he would move for Dismissal for Cause proceedings against Plaintiff. The Provost also notified Plaintiff that his job duties with the University, including any and all contact with students, were suspended immediately pending conclusion of a dismissal for cause proceeding. Plaintiff appealed the Provost's decision to the University's Faculty Personnel Committee ("FPC") pursuant to the University's appeal procedures.

On February 23, 2010, the FPC began a three-day evidentiary hearing. During the hearing, Plaintiff admitted that he and B.V. had a sexual relationship that started in the summer of 2007. The relationship continued up and until Plaintiff's wife confronted B.V. and Plaintiff about the affair. Professor Hoelscher testified that, at the time she confronted Plaintiff, she showed him a copy of the University's Harassment Policy and requested that he end the affair. Professor Hoeslcher further testified that Plaintiff became defensive and refused to end his relationship with B.V. Plaintiff indicated that he ended his affair with B.V. in mid-November of 2007. The FPC determined that Plaintiff's sexual relationship with B.V. created a conflict of interest and violated the University's Policy because he took no steps to resolve this conflict by remaining B.V.'s sole instructor in a fall 2007 course and assigning her a grade.

In addition, Plaintiff admitted that he "crossed the line" when he engaged in sexually explicit chat and e-mail exchanges with D.C. in the fall of 2006 and spring of 2007 while he taught and otherwise supervised D.C. as a student artist. The FPC determined that Plaintiff's conduct toward D.C. created a conflict of interest and violated the University's Harassment Policy. The FPC further found that Plaintiff lied to Faculty Investigators on two different occasions about his sexual relationship with B.V.

6

Upon review of the testimony and documentary evidence presented at the hearing, the FPC unanimously found that Plaintiff had violated the Harassment Policy and a majority of the FPC voted to recommend termination of Plaintiff's employment for cause. On May 20, 2010, the University's Board of Trustees, upon consideration of the FPC's recommendation and report, voted to permanently revoke Plaintiff's tenure and terminate his employment immediately.

During the pendency of the dismissal proceedings, and on November 23, 2009, Plaintiff filed concurrent Charges of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Pennsylvania Human Relations Commission ("PHRC"), averring disability discrimination claims. Plaintiff alleged that shortly before Professor Pepper filed the Internal Complaint, Plaintiff notified Professor Pepper that he might need to have surgery on his hand and require further accommodation.[1] Plaintiff claimed that other employees without disabilities who violated the University's Harassment Policy were not similarly subject to dismissal, but rather were required to sign a confidential agreement indicating they would not violate the Policy again. Upon review, the EEOC was unable to conclude that a violation of the federal statutes occurred and issued Plaintiff a Notice of Right to Sue. Plaintiff then filed the instant action.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the movant establishes that "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Levy v. Sterling Holding Co., LLC*, 544 F.3d 493, 501 (3d Cir. 2008). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both

---

[1] Plaintiff has provided two dates regarding this alleged exchange with Professor Pepper. During his deposition testimony, Plaintiff testified that the exchange took place sometime after "Thanksgiving 2008" and before December 4, 2008. *See* Def.'s Br., Exhibit B, at 74:9-14. In contrast, Plaintiff's Statement of Undisputed Material Facts states that this exchange took place in April 2009. *See* Pl.'s Statement of Undisputed Material Facts, at ¶ 9-12.

genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant, and it is material if, under the substantive law, it would affect the outcome of the suit. *See Fakete v. Aetna, Inc.*, 308 F.3d 335, 337 (3d Cir. 2002). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. *See Celotex v. Catrett*, 477 U.S. 317, 327 (1986).

Once the movant has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Under Rule 56(e), the opponent must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *See Martin v. Godwin*, 499 F.3d 290, 295 (3d Cir. 2007). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and inferences in the light most favorable to the non-movant. *See Matsushita*, 475 U.S. at 587; *Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001).

### III.     DISCUSSION

Lehigh University brings the present motion for summary judgment, arguing that Plaintiff cannot establish a viable disability claim. More specifically, Lehigh contends that Plaintiff fails to establish a prima facie case of discrimination because he does not present sufficient evidence to raise an inference of discrimination with respect to the University's

8

decision to terminate his employment. Lehigh further argues that even assuming *arguendo* that Plaintiff can make out a prima facie case of discrimination, Plaintiff's claims still falters under the pretext prong. Plaintiff, on the other hand, avers that an inference of discrimination arises from the fact that he was replaced by a non-disabled person, and that pretext can be sufficiently demonstrated by Lehigh's preferential treatment of similarly situated persons outside of his protected group, the temporal proximity between the disclosure of his disability and the initiation of termination proceedings, and the very fact that Plaintiff did not engage in sexual harassment.

Because Plaintiff's disability claim is anchored on circumstantial evidence, this Court must evaluate his claim under the burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *See Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000). Under the *McDonnell Douglas* framework, Plaintiff must first establish a prima facie case of discrimination. If Plaintiff succeeds in doing so, the burden of production shifts to Lehigh "to articulate some legitimate, non-discriminatory reason" for its decision to terminate Plaintiff. *McDonnell Douglas*, 411 U.S. at 802. If Lehigh carries its burden, Plaintiff must have the opportunity to prove that the reasons offered by Lehigh were not its true reasons, but rather a pretext for discrimination.

### A. Plaintiff establishes a prima facie case.

In order to establish a prima facie case of disability discrimination under the ADA, Plaintiff must show that: (1) he is disabled; (2) he was qualified for the job; and (3) he suffered an adverse employment action under circumstances that would give rise to an inference of discrimination. *Shaner*, 204 F.3d at 500. While courts sometimes add a fourth element requiring plaintiffs to establish that other employees not in the protected class were treated more favorably or that plaintiff was replaced by a person outside her protected class, creating an

inference of discrimination, the Third Circuit has instructed that such a requirement is not always necessary. As the court stated in *Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 357 (3d Cir. 1999),* "[w]e have repeatedly emphasized that the requirements of the prima facie case are flexible, and in particular, that 'the fourth element must be relaxed in certain circumstances....'" *Pivirotto*, 191 F.3d at 357 (citing Torre v. Casio, Inc., 42 F.3D 825,831 (3d Cir. 1994)). In addition, Plaintiff's burden of establishing a prima facie case is not an onerous one. *Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248,253 (1981).*

Lehigh admits that Plaintiff can establish that he suffered an adverse employment action and, for purposes of its present motion, is a disabled person within the meaning of the law. However, Defendant argues that Plaintiff cannot establish his prima facie case because he fails to present evidence that raises an inference of discrimination with respect to its decision to terminate his employment. (*See* Def.'s Br., at 14). More specifically, Lehigh contends that Plaintiff does not sufficiently demonstrate that the University treated similarly situated employees who also violated the Harassment Policy more favorably than Plaintiff. (*Id.* at 15-17). Plaintiff rebuts this assertion, arguing that the fourth element of the prima facie test is met by fact that Lehigh replaced Plaintiff's position with a non-disabled employee.[2] While scant, the Court does find that Plaintiff has adduced sufficient evidence to establish a prima facie case. Fortunately, Plaintiff's burden is not an onerous one.

---

[2] Although Plaintiff presents no evidence as to how he has actual knowledge that Professor M.K. is a non-disabled employee, the Court will afford him the benefit of the doubt for purpose of our analysis of the case.

B.  **Lehigh proffers a legitimate, non-discriminatory reason**.

Since Plaintiff establishes a prima facie case of discrimination, the burden shifts to Lehigh to articulate some legitimate, non-discriminatory reason for its decision to terminate Plaintiff's employment. Lehigh "satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reasons for the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The Court finds that Lehigh satisfies its burden at this stage by adducing evidence that Plaintiff was terminated for violating the University's Harassment Policy by engaging in romantic, sexual relationships with University students D.C. and B.V. during periods of time that he supervised the student's work, as well as for lying to Faculty Investigators about these relationships during the University's internal investigation.

C.  **Plaintiff fails to show pretext**

In order to defeat Lehigh's motion for summary judgment, Plaintiff must provide evidence, "direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating factor or determinative cause of the employer's action. *Fuentes*, 32 F.3d at 764. In doing so, "the non-moving plaintiff must demonstrate such weakness, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non-discriminatory reason.'" *Id.* at 765 (quoting J*osey v. John R. Hollingsworth Corp.*, 996 F.3d 632, 638 (3d Cir. 1993)).

Plaintiff attempts to prove that Lehigh's reason for his termination is masked invidious

discrimination by pointing to several pretext factors. For the reasons discussed below, the Court finds that Plaintiff fails to meet his burden.

### 1. *Similarly situated employees*

Plaintiff's pretext claim primarily relies on evidence which he contends demonstrates that similarly situated employees who are non-disabled were treated more favorably than him. Specifically, Plaintiff claims that several University employees engaged in comparable conduct but received either a lesser form of discipline or no discipline at all. One of the comparators is Dr. B, a University professor who had a student complaint of sexual harassment filed against him for inappropriately touching a female student after imbibing alcohol. When the University determined that Dr. B's conduct violated the Harassment Policy, Dr. B voluntarily relinquished his position as Director of the Humanities Center and forfeited the Williams Selfridge Professorship, but he was not terminated. Plaintiff also points to incidents involving Ms. K.F. and Dr. T.B as evidence of comparable conduct by non-disabled employees. Plaintiff testified that he saw Ms. K.F. kiss and provocatively touch a University student at an off-campus gathering, and that Dr. T.B. had a sexual relationship with a University student and cohabited with her. Unlike Plaintiff and Dr. B, Ms. K.F. and Dr. T.B. did not have a complaint of sexual harassment filed against them and suffered no disciplinary action.

Certainly, disparate treatment of a plaintiff's comparators is evidence of pretext and can give rise to an inference of discrimination. But the comparator evidence presented by Plaintiff is unconvincing. Plaintiff fails to demonstrate that "[t]he similarity between the compared employees . . . exist in all relevant aspects of their respective employment circumstances." *Jackson v. Planco*, 660 F.Supp.2d 562, 577-78 (E.D. Pa. 2009). While the Court rejects Lehigh's argument that Plaintiff's comparators are not "similarly situated" because these

employees "did not work in the same department or share the same supervisor," (see Def's Br., at p. 15), the Court does not find that Plaintiff's comparators "engage[d] in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or their employer's treatment of them for it." *Davis v. City of Philadelphia Water Dept.*, 57 Fed. Appx. 90, 92 (3d Cir. 2003).

Even though Plaintiff and Dr. B were both found to have violated the same policy, the University's Harassment Policy gave Lehigh the discretion to assess these instances of sexual harassment on an individual basis and impose appropriate discipline. *See* Lehigh University's Policy on Harassment § 7.1 (permitting the University to impose discipline up to and including termination). It is undisputed that, following the incident, Dr. B testified truthfully during an internal investigation and voluntarily proposed and carried out remedial actions for his behavior. Plaintiff, on the other hand, lied to Faculty Investigators on two occasions about his sexual relationships with University students B.V. and D.C. Moreover, while Dr. B was disciplined for an isolated incident of sexual harassment involving one student, Plaintiff was disciplined for repeatedly violating the University's Policy by having an on-going relationship with two students while the students were under his supervision. Thus, Plaintiff's insistence that him and Dr. B engaged in comparable conduct with respect to *all* relevant aspects of their circumstances is meritless, and Lehigh was within its discretion to terminate Plaintiff while retaining Dr. B, particularly given the undisputed factual differences between Plaintiff's actions and the actions of Dr. B.

The Court also finds that Ms. K.F. and Dr. T.B. are not similarly situated to Plaintiff. Unlike Plaintiff, no evidence suggests that a complaint of sexual harassment was filed against these two University employees or that they lied to Faculty Investigators during an internal

investigation. Furthermore, Plaintiff's bare assertions regarding Dr. T.B. do not suggest that Dr. T.B. engaged in a sexual or romantic relationship with a University student while the student was under his supervision – a key factor in determining whether an employee has in fact violated the Policy. As such, the Court finds that Plaintiff fails to sufficiently demonstrate that these individuals engaged in comparable conduct and are therefore similarly situated.

### 2. *Temporal proximity*

Plaintiff also argues that the temporal proximity between him disclosing his hand disability to Professor Pepper in April 2009 and the May 12, 2009 Investigation Report recommending that he be terminated shows that the reasons Lehigh gave for his termination are pretextual. The Court disagrees. Although factors including the timing of an employee's dismissal and the employer's treatment of the employee could raise an inference of pretext, there must be some logical connection between timing and/or treatment and the possibility of the particular discrimination at issue. *Josey,* 996 F.2d at 638-41; *see also Walton v. Mental Health Ass'n of Southeastern Pennsylvania*, 168 F.3d 661, 669. Here, Plaintiff presents no evidence connecting the timing of dismissal with a discriminatory motive.

First, Lehigh correctly points out that the undisputed record establishes that an internal investigation into Plaintiff's conduct with University students began well before he disclosed his hand disability to Professor Pepper. Professor Pepper filed an Internal Complaint on December 4, 2008, which initiated an internal investigation into the reports received by D.C. and Professor Hoelscher. Second, Plaintiff does not allege any conduct suggesting that the Faculty Investigators were aware of or considered Plaintiff's disability and accommodation request during or after the internal investigation and termination proceedings. The mere fact that the Faculty Investigator's report findings and recommendation for termination came two weeks after

14

his exchange with Professor Pepper is insufficient to establish pretext. *See generally Helm v. Matrix Servs. Indus. Contractors*, No. 07-4622, 2008 WL 4889013 (E.D. Pa. Nov. 12, 2008) (granting summary judgement for employer on retaliation claim, holding that "suspicious timing alone will oridinarily be insufficient to create a causal link."). As such, Plaintiff fails to present sufficient evidence to create a logical connection between these events for purposes of establishing pretext.

### 3. *Replaced by non-disabled employee*

Plaintiff contends that Lehigh's decision to replace him with a non-disabled individual is further evidence of pretext. "Such an inference may be acceptable at the prima facie stage of the analysis where the inquiry is based on a few generalized factors, but not necessarily at the pretext stage where the factual inquiry into the alleged discriminatory motives of the employer has risen to a new level of specificity." *Simpson v. Kay Jewelers*, 142 F.3d 639, 646 (3d Cir. 1998)(internal citations omitted). Additionally, the Court adopts Lehigh's argument that the fact that a non-disabled employee is now performing Plaintiff's job cannot alone sufficiently support Plaintiff's pretext burden. *See* Def.'s Reply Br., at p. 6 (citing *Stahlnecker v. Sears*, No. 08-0681, 2009 WL 661927, at *6-7 (E.D. Pa. Mar. 11, 2009).

### 4. *Sexual harassment conduct*

Plaintiff's attempt to satisfy his pretext burden by simply arguing that he did not violate Lehigh's Harassment Policy because his conduct did not amount to "sexual harassment" is also unavailing. The Third Circuit has made clear that "it is not enough for plaintiff to show that the employer's decision was wrong or mistaken because the issue is whether the employer acted with discriminatory animus." *Abramson v. William Paterson College of N.J.*, 260 F.3d 265,283 (3d Cir. 2001). Plaintiff's belief that Lehigh made a wrong decision is of no consequence in a

pretext inquiry, as it is only Lehigh's belief relative to its proffered reason that is relevant.

## I. CONCLUSION

Because Plaintiff has presented no evidence suggesting that the reasons for his termination were actually motivated by discriminatory animus, this Court will grant summary judgment in favor of Defendant. An appropriate order follows.